Filed 7/27/22  P. v. Zamora CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SANTIAGO MANUEL ZAMORA,<br><br>    Defendant and Appellant. | F080140<br><br>(Super. Ct. No. 11CMS4083)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Robert Shane Burns, Judge.

Spolin Law, Aaron Spolin, Jeremy M. Cutcher and Erick Munoz for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Santiago Manuel Zamora was charged on March 15, 2016, with a sole count of premeditated murder (Pen. Code, § 187, subd. (a)) [1] which occurred in November of 2011.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

Numerous firearm allegations were also alleged (§§ 12022.53, subds. (b), (c), (d), 12022.5, subd. (a)(1)).

Jury trial began in July 2019, three years after Zamora was charged. Zamora was found not guilty of first degree murder, but guilty of second degree murder. The associated firearm allegations were found true.

Zamora was sentenced to 15 years to life, plus 25 years for the firearm enhancement (§ 12022.53, subd. (d)). Punishment on the remaining firearm enhancements was stayed.

On appeal, Zamora contends that the trial court erred in numerous ways: admitting his pretrial statements for impeachment purposes; refusing to give a requested discovery violation instruction to the jury; in excluding gang expert testimony; excluding witness testimony on the issue of Zamora being shot in Lemoore; and denying Zamora's request to instruct the jury with CALCRIM No. 505. He further contends *Brady*[2] error and prosecutorial misconduct occurred, as well as cumulative error. Finally, Zamora contends remand is required to allow the trial court to exercise its discretion pursuant to newly amended section 1385. We agree with Zamora's last contention for remand and otherwise affirm.

## STATEMENT OF THE FACTS

*Circumstances Leading to Isaac Donez's Murder*

In November 2011, Elizabeth Renee Vasquez was in a relationship with Zamora. Renee's brother, Emmanuel Joe Donez (Joe),[3] saw Facebook posts about incidents between Zamora and Vasquez which angered Joe, as he believed the relationship was abusive.

*The Murder of Isaac Donez*

On November 28, 2011, shortly after Thanksgiving, Joe went to find Vasquez and Zamora at the residence of Joe's cousin Danny Gaytan, so that Joe could talk to Zamora,

---

[2]     *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

[3]     We refer to various individuals with first names rather than last to avoid confusion.

although it crossed his mind that the encounter might come to blows. Cynthia Donez (Cynthia), Joe's wife, drove a white Dodge with Joe, Joe's stepbrother Isaac Donez (Isaac), and another of Joe's cousins, Timothy Young, to Gaytan's house.

When the group arrived at Gaytan's residence on Meadow Place, in Lemoore, Cynthia parked the Dodge next to the passenger side of a black SUV, with the front of the Dodge lined up with the passenger door of the SUV, both facing the front of Gaytan's house.

Cynthia stayed in the Dodge while the others got out. Joe noticed that another cousin, Adrian, was in the SUV, and Young and Isaac went to say hello to Adrian, who was "pretty much" in the same gang as Isaac. Joe knocked on the door of Gaytan's house and someone let him in. Once inside, Joe went into the garage and spoke to Vasquez, telling her he wanted to speak to Zamora. Joe and Vasquez made their way back into the house and out the front door of the residence.

While Joe was in the front yard, he saw Zamora emerge from the shadows by the driveway. Joe raised his hand, pointed at Zamora and asked if he was "Santiago." Zamora said he was, and Joe confronted him and asked why he had "put hands" on Vasquez. Zamora responded by asking Joe if he wanted to "get beast." Joe did not know what that term meant, but "gang members use it."

The confrontation between Joe and Zamora lasted a few minutes. At one point, Joe called Zamora names and Zamora pulled a gun from the left side of his waistband, cocked it, and held it to the left side of his body. Joe, who thought the gun looked like a nine-millimeter firearm, told Zamora he could put the gun down and the two of them could fight, one-on-one, in the street. Young intervened and tried to dissuade the two. Joe stopped and he and the others began to leave the area.

Before leaving, Joe walked over to Gaytan, who was outside, and apologized for disrespecting him at his house. Joe then walked back to the Dodge. As he did, Zamora went to the driver's side of the SUV. Young moved to a location between the passenger's

side of the SUV and the driver's side of the Dodge. Zamora and Isaac briefly exchanged words. Cynthia overheard Zamora say something, and Isaac responded, "we can do this at the park, homie." As Isaac walked away from Zamora, gunshots rang out.

Three shots were fired initially, followed by a brief pause and additional shots. During the shooting, both Joe and Cynthia heard the sound of breaking glass. Joe believed only one gun was fired during the shooting; another person in the area also thought the multiple gunshots sounded similar.

After the shots were fired, there were flashes and Isaac turned and fell to the ground. Young took cover between the SUV and Dodge. Zamora and Isaac were both in the area of the flashes, which Cynthia thought came from "in front" of Isaac.

A neighbor of Gaytan's, Kathleen Duarte, heard gunshots and saw flashes coming from "an SUV" and going towards the "white car." Duarte did not notice anyone shooting into the SUV.

During the incident, neither Joe nor Cynthia ever saw Isaac or Young with a weapon. At trial, Joe denied ever having told Detectives Janette Hanes or Mike Wallace that Young fired two to four shots at Zamora with a .45-caliber gun.

When Isaac fell to the ground, Joe yelled at Young to grab Isaac. Zamora and another man got into the SUV and almost ran over Isaac as they left the scene. Joe and Young got Isaac, who had two gunshot wounds to the back, into the Dodge and Cynthia drove all of them to the hospital. Prior to arriving at the hospital, Young, who may have been on probation, got out of the Dodge and fled.

Prior to the arrival of the police, neighbor Duarte saw females picking up shell casings or bullets on the ground.

_Police Investigation_

Later that November evening, Lemoore police officer Michael Kendall received a call of shots fired and a possible suspect vehicle described as "a black SUV." When

4.

Kendall arrived, he saw three females in front of the Meadow Place residence. The females, one of them later identified as Vasquez, tried to get back into the residence.

On the same evening, police officer and later Detective Albert Avelar saw a black SUV in the parking lot of an apartment complex on East Spruce Avenue, approximately one-half mile from Meadow Place, and near where Joe lived. Detective Avelar watched the parking lot where the SUV was parked and saw two vehicles, a silver-gray Chrysler 300 and a minivan, pull into the parking lot and then leave after a brief period of time. At the time, Joe's sister, Brianda Diaz[4], had a dark grey/silver Chrysler 300. After the vehicles left, Commander Kendall arrived and he and Detective Avelar approached the SUV, which had at least one broken window. Other law enforcement was alerted.

Also on the same evening, police evidence technician Jonathan Ferrell arrived at Meadow Place and saw broken glass and a nine-millimeter shell casing, which had "9MM Luger" on it, on the ground. A copper-jacketed bullet was found in the road and another inside a trailer parked at Meadow Place. An unspent .45-caliber cartridge was found on the sidewalk and another in the grass nearby.

From the Meadow Place crime scene, Ferrell went to the East Spruce Avenue location and saw a black SUV being loaded onto a flatbed. The SUV's right rear window and driver's side window were broken and there was glass on the driver's seat. There was also a shell casing on the driver's seat that had "9MM Luger" on it. The interior of the SUV had a cracked hole in the rear fender well. Inside the well was a copper-jacketed piece of metal. A shell casing on the back passenger's seat on the driver's side and another under that seat were found. The casing under the seat had "9MM Luger" on it.

There was no blood found in the SUV, except for possibly one drop of blood on a white glove found in the glove compartment.

---

[4]     Brianda is referred to in the record as both Brianda Hernandez and Brianda Diaz. We will refer to her as Diaz, as she testified at trial in that name.

Jessica Winn, a firearms expert, analyzed the two found bullets and described them as "nominal .38 caliber bullets," which includes a large range of different types of bullets. The two recovered bullets were consistent with .99 Luger bullets and Winn opined both were fired from the same gun. One of the bullets was damaged, which indicated it may have hit some glass. Winn also analyzed three recovered nine-millimeter Luger casings and concluded all three had been fired from the same firearm. Winn testified that the bullets and casings could have been fired from the same gun, but could not say for certain.

Former Police Detective Michael Wallace attended one or more of the police interviews with Joe. Detective Wallace never heard Joe say that anyone other than Zamora had a gun during the shooting.

## Isaac's Cause of Death

Dr. Gary Walter performed an autopsy on Isaac and observed two gunshot entry wounds to Isaac's back, one on the left back and one to the left buttock. Both gunshots exited the front right side of Isaac's body. Dr. Walter opined that the wound to Isaac's buttock was fatal, as it entered Isaac's body at an upward angle and caused damage to his kidney and liver.

## Zamora's Arrest

Five years after the murder of Isaac, in October 2015, law enforcement went to a particular residence looking for Zamora. Once there, they announced their presence and ordered the occupant to come outside. Kings County Deputy Sherriff Grecia Thomas noticed a person lying flat on his back with his hands at his side on a nearby rooftop. The person turned out to be Zamora, who had gone out of the window of the residence when law enforcement arrived.

Zamora, who initially identified himself as Eduardo Guzman, was arrested. His girlfriend at the time, Sujey Franco, told officers Zamora had never told Franco his name was Santiago Zamora, even though they had been together three months. Zamora and Franco married two months after his arrest in December 2015.

6.

Franco spoke to officers on the date Zamora was arrested. Franco told officers she and Zamora, whom she referred to as "Ed," had primarily dated in Franco's house, because "Ed" did not want to go out in public. On one occasion, Franco took a photograph of "Ed" and posted it on social media. "Ed" got upset with Franco, called her a name, and broke up with her.

*Defense Witnesses*

In November of 2011, evidence technician John Ferrell went to an apartment at the East Spruce Street location and found a bag containing ammunition and high capacity magazines.

Criminalist Mindy Crow examined the recovered bullets from the scene and determined there was no blood on them. Crow examined the SUV and saw a bloodstain on a white glove in the glove compartment, but that was the only bloodstain found.

Retired criminalist William Matty examined the evidence in the case and reviewed the lab reports. According to Matty, the .45-caliber cartridges had scratches on the cartridge case, indicating they had been loaded in a gun and manually extracted. He also testified that one of the bullets in the .45-caliber cartridges had been pushed rearward to some degree, which can happen when a gun fails to properly cycle the cartridges into the chamber and jam the gun.

Gaytan's neighbor, Duarte, made a statement on the date of the incident that she had heard three or four shots as she was sitting in her living room. Duarte also stated she then walked to the door and heard two more pops and saw two flashes in an SUV.

In November of 2011, Janette Hanes, then a detective with the police department, interviewed Joe in connection with the shooting in this case. Most of the conversations between Hanes and Joe were recorded, although a few minutes were not. Detective Hanes testified at the preliminary hearing that Joe had told her Young had a gun and had shot it on the night in question, something which was noted in her police report, but at trial she testified the statement was not included in the recorded statement.

7.

On cross-examination, Hanes acknowledged that she had reviewed the recording of the interview she conducted with Joe, and, in the recordings, Joe had stated that Young did not have a gun. Hanes testified that, if she could rewrite her report, it would not include a statement that Young had a gun because Joe never said that. The shooting was Hanes's first homicide case; she retired from law enforcement in 2016.

On redirect examination, Hanes claimed to have made a mistake, but then claimed she did not know if she had. Hanes testified that she had taken notes during her interview with Joe and based her report on those notes, not on Joe's recorded statement.

On recross-examination, Hanes testified her report was a brief summary of the case and, based on that summary, she believed Zamora had fired first during the shooting.

Detective Mike Wallace was recalled and testified that he spoke with Joe and did not recall Joe saying that Young had fired two to four shots at Zamora with a .45-caliber handgun, even though Detective Wallace's December 9, 2011, report stated that Joe had said this. Detective Wallace explained that his report was a supplemental report and merely summarized the other police reports, including Hanes's report referring to a statement that Hanes believed Joe had made.

Diaz, Zamora's sister, spoke with police investigators on December 2, 2011, and provided them with Facebook postings related to Joe she had received about one month before the shooting. When Diaz had spoken to Detective Wallace earlier on November 29, 2011, she stated she had not seen Zamora in weeks, although, at trial, she said this was a lie. Diaz drove a silver Chrysler 300.

Zamora testified in his own defense. According to Zamora, he lived at Gaytan's house in September through November of 2011, and also had a room at his mother's house in Hanford at the time. Vasquez stayed with him at Gaytan's house, and Zamora admitted that he hit Vasquez in the past when he was angry.

Zamora and Vasquez shared a Facebook account and Zamora's sister showed Zamora Facebook postings in which Joe communicated that he wanted to fight Zamora.

Zamora interpreted these postings as a threat, and Zamora had information suggesting Joe was looking for him.  For this reason, as well as "other threats," Zamora obtained a weapon for defense.

On the evening in question, Zamora borrowed a black SUV from his friend, Tino, and planned to return it after shopping.  When Zamora found out Tino wanted some cigarettes, Zamora went back to Gaytan's to pick some up to take to Tino.  Zamora then left Gaytan's house from the garage and went out the side gate.  As he walked to the SUV, he heard someone yell, "[H]ey, are you Santiago?"  Zamora turned and yelled back, "[Y]eah, what's up?"  Zamora then noticed three males walking towards him in a triangular formation, with Joe in front flanked by Isaac and Young.  Isaac and Young pulled out guns, and Joe was tucking his shirt over an object in the front of his body.

One of the three said, "[O]h, you ain't so hard now, motherfucker," and another said, "[Y]ou got to see us now, motherfucker."  Zamora took out his weapon, took the safety off, and told the three, "[Y]ou guys are confused, I don't have to see nobody."  Zamora was afraid for his life and told them that, if one of them shoots him he was going to shoot back.  Joe called Zamora names and told him to get out of his "hood."  At the time, Zamora was about three of four yards from the SUV.  Zamora denied using the term "beast mode."

While this was going on, Gaytan came out of his house and said he did not want "this shit" at his house and demanded that they leave.  The three men separated and one of them said, "[A]ll right, Tio," and another said "[L]et's meet at the park then."

Zamora testified that he agreed to meet at the park even though he did not intend to do so.  Young and Joe went around the front of the SUV and Isaac went around the back.  Zamora assumed all three were walking to the other car in the driveway.  Zamora turned to say something to Gaytan and, as he did so, the back of the SUV was at an angle slightly behind him.

Zamora heard Isaac yell, "Norte, bitch," a shot rang out and something hit Zamora's shoulder.  Zamora thought he had been shot and fired his nine-millimeter gun two or three

times in the direction where he had last seen Isaac, the same direction from which the initial shot was fired.

After firing back, Zamora ran to the SUV and got into the driver's seat. He put the car in neutral by mistake and more shots were fired. Zamora returned fire while in the SUV. During the shooting, the back passenger's side window, the back driver's side window, and the driver's window were broken. Two of Zamora's friends were in the SUV during the incident, including Zamora's friend "Edgar," who was in the passenger's seat.

After the shooting, Zamora fled from the area in the SUV and drove to Tino's. Tino lived in a building next to the building where Joe and Cynthia lived, which Zamora knew. Once there, Zamora told his fellow passengers that he had been shot, which they did not believe until they saw "it." Zamora testified that he was bleeding profusely from two different locations on his body. He got out of the SUV and ran to Tino's and banged on the door. Zamora did not have a chance to clean up the SUV; his friends stayed in the vehicle.

Once inside Tino's place, Zamora took off his jacket and shirt and showed Tino his injury. A bullet had struck Zamora in the back, just below the neck and exited though his left shoulder, and the wound was bleeding. Zamora asked for help and eventually, "a lady that was a nurse," a neighbor of Tino's, came and cleaned, sewed and bandaged the wound.

While at Tino's, various other people also arrived, including Zamora's sister, Brianda. Brianda and another person took Zamora to his aunt's house in Hanford.

Zamora did not go to the police or a hospital, but instead he and Vasquez spent the night in a hotel before Zamora, who feared for his life, fled to Mexico, where he stayed for several years. According to Zamora, someone in Tijuana treated his wound. Zamora returned to the United States at some point, crossing through the desert instead of going through customs, as he knew there was a warrant out for his arrest.

After Zamora was arrested, he was interview by Detective Avelar. Zamora initially told Detective Avelar his name was "Eduardo Guzman" and stated he wanted an attorney present during the interview. Zamora acknowledged that he later lied to Detective Avelar,

10.

telling him he was not present at the shooting, that he was not driving the SUV, or that he was with Vasquez. Zamora acknowledged he may have told Detective Avelar that he was on PCP on the day of the shooting, but that was a lie because he had never used PCP. Zamora did not tell Detective Avelar that the three men approached him with guns, yelled "Norte bitch" and shot him in the back. Zamora testified that he was afraid to tell Detective Avelar the truth as he did not trust the police and wanted an attorney. He was also not sure what he had done on the night of the shooting was justified. Zamora claimed that, when he told Detective Avelar he had been shot, he was not saying he had been shot in Mexico, but was volunteering about having been shot in Lemoore while talking to Detective Avelar about Mexico.

Elizabeth Quair testified that she saw Zamora at her father-in-law's residence on the day of the shooting. Zamora had an injury to his upper back on the left side and there was blood coming from the injury. However, when Quair spoke to police on December 5, 2011, she did not mention seeing blood on Zamora. And she acknowledged that she told officers she had not seen Zamora in months. Zamora's sister was married to Quair's cousin. Quair last spoke with Zamora in January 2019 and was interviewed by defense investigators after that. It was at that point that Quair recalled seeing blood on Zamora.

Diaz, Zamora's sister, testified that she saw an injury on Zamora when Zamora was getting out of a car at Quair's house on the day of the shooting. Zamora had a wrap around his shoulder, but she did not see any blood. Zamora appeared to be in pain.

Gloria Mendez, Zamora's aunt, saw an injury on Zamora on the evening of the shooting. According to Mendez, Diaz brought Zamora to Mendez's place that night and Zamora had an injury that "looked pretty ugly." Mendez saw a small amount of blood and a white bandage behind Zamora's left shoulder, which she removed and saw a hole.

Private Investigator Thomas Edmonds had previously worked as a chief deputy coroner for Kings County and a former homicide detective and was familiar with gunshot wounds. Edmonds was hired by Zamora's former attorney to examine Zamora with Dr.

11.

Burr Hartman in March of 2016.[5]  Edmonds also looked at Zamora's shoulder during a break in the current trial.

According to Edmonds, during the 2016 observation, Edmonds saw scar tissue on the left side of Zamora's back toward the base of his neck which was in alignment with another scar four inches away toward the front of Zamora's shoulder.  While Edmonds could not say when the injury occurred, the scarring was consistent with a gunshot wound.

*Prosecution Rebuttal*

Detective Avelar testified that his interview with Zamora was recorded.  In the interview, Zamora repeatedly stated he was never at the shooting, he denied borrowing Tino's SUV on the date of the shooting, and he claimed not to have a gun.  At one point during the interview, Zamora stated he was using "PCP, methamphetamines," and that he had used a mix of drugs around Thanksgiving (presumably 2011).  Zamora admitted having gone to a drug rehabilitation clinic in the past.

During the interview, Zamora stated he had been to Mexico and while talking about Mexico, stated he was shot, sliced in the neck, and beaten for hours "over there."  While saying this, Zamora dropped his left shoulder towards Detective Avelar and showed him where he had been shot.  He also pointed to the part of his neck where he had been slashed.

Cynthia was recalled as a witness and testified that, a minute prior to the shooting, she heard Isaac say, "[W]e can take this to the park, homie."  He then walked toward her car, and she heard him scream.  Cynthia never heard anyone yell "Norte, bitch."  Cynthia saw flashes behind Isaac as he was facing her direction.  Cynthia, who could clearly see Isaac, saw that he was not holding anything.  Cynthia explained that, when she had earlier said that the flashes were in front of Isaac, she was trying to explain that Isaac was already looking at her when the flashes occurred and that they were in front of the area where Isaac

---

[5]     Dr. Hartman was not a witness at the trial.

had been previously. Cynthia testified to a second series of shots that came from the front of the SUV. The first set of shots hit Isaac, who was not shooting.

A day after the shooting, Detective Wallace interviewed Diaz, who said she had not seen Zamora in two or three weeks, and that he was "out of control" and no longer living in the family residence.

*Defense Surrebuttal*

Zamora was recalled and testified that, when he told Detective Avelar he had been shot, he was responding to Detective Avelar's statement that the police thought Zamora was dead. When Zamora said he had been shot, sliced in the neck, and beaten up for hours, he did not mean that all of those things had happened at one time. According to Zamora, he decided to come back to the United States from Mexico after he got mugged, robbed, and sliced in the neck. Zamora claimed that, at one point, Detective Avelar asked him if he had been shot in Mexico, but this was not recorded.

On cross-examination, Zamora admitted that, during the interview, when he said, "look it right here, I got shot, sliced my neck, beat for hours over there," that the words, "over there" referred to Mexico. He also acknowledged that he had not previously testified at trial that he had spoken with Detective Avelar off the record about being shot.

*Prosecution Surrebuttal*

Detective Avelar was recalled and testified that, after the 2015 recorded interview, he never spoke with Zamora again other than some small talk on the way to jail and nothing having to do with the facts of the case. While taking Zamora to jail, Detective Avelar never asked Zamora if he had been shot.

*Verdict and Sentencing*

On July 18, 2019, the jury found appellant not guilty of first degree murder, but guilty of second degree murder. The associated firearm allegations were found true.

On October 4, 2019, appellant was sentenced to 15 years to life for the murder, plus 25 years to life for the associated firearm enhancement pursuant to section 12022.53,

13.

subdivision (d). Punishment on the remaining firearm enhancements was stayed. On October 16, 2019, appellant filed a timely notice of appeal.

## DISCUSSION

I.        DID THE TRIAL COURT ERR IN ADMITTING ZAMORA'S PRETRIAL STATEMENTS FOR IMPEACHMENT PURPOSES?

Zamora first contends that the trial court prejudicially erred when it allowed the prosecutor to impeach his trial testimony with pretrial statements he made to Detective Avelar. We disagree.

### Zamora's Pre-Trial Interview

Detective Avelar's interview with Zamora was recorded and transcribed.[6] When Detective Avelar began his interview with Zamora, he read Zamora his *Miranda*[7] rights. When asked if he understood his rights, Zamora replied that he did. Detective Avelar provided Zamora with some tissues and then asked if he needed anything else. Zamora replied, "A lawyer too." Detective Avelar confirmed that Zamora wanted a lawyer and Zamora reiterated that he wanted a lawyer because he did not know "what's going [on] here." Detective Avelar explained to Zamora that he was under arrest for a homicide that occurred in 2011 and that he wanted to get Zamora's side of the story. Zamora again said that he did not know anything and that he wanted a lawyer. Detective Avelar stated that he could not actually summon a lawyer to the interview and that this was something Zamora would have to work out later.

Detective Avelar then stated he would not ask any more questions if Zamora wanted to speak with a lawyer, but that he needed Zamora's contact information in order to fill out a

---

[6]      Zamora's pretrial interview with Detective Avelar was recorded. Transcriptions of the recording were attached to the defense trial motion and prosecution's opposition to the motion. There are slight variations in the transcriptions, and we use the one provided by the defense, to give Zamora the benefit of the doubt. The record was augmented by a video of the interview, which we have reviewed.

[7]      *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

14.

booking sheet. Zamora said his name was "Eduardo Guzman," and gave his height, weight, date of birth, and hair and eye color. He initially provided one birthdate, but then changed it to another date with a different day and month four years apart.

During these booking questions, Zamora stated that he did not want to spend any time locked up. Detective Avelar asked Zamora if he had children, and Zamora said he had two. Zamora lamented his current circumstances, and Detective Zamora agreed that it was a "shitty situation." Zamora replied that it was not Detective Avelar's fault. Detective Avelar asked Zamora if he wanted to contact his parents. Zamora said, "do what you can for me, Sir," but he did not know his mother's telephone number.

Zamora then talked about his upbringing and how he could "probably blame it all on that." Detective Avelar agreed, and Zamora then said he grew up using drugs. Zamora told Detective Avelar that he wished there was a "faster way" out of his current situation, and that he had "fled" because he was scared. Zamora admitted that he lied to Detective Avelar.

Detective Avelar then told Zamora that he could not ask Zamora "anything" without reminding him of his rights. When asked if Zamora remembered, the transcription reads "[Yes, Sir?]."[8] Detective Avelar then asked Zamora if he wanted those rights read to him again, and Zamora said "No, Sir." Detective Avelar then asked Zamora if he understood his rights and Zamora said "Yeah." Detective Avelar told Zamora not to worry about having lied earlier, and Zamora said he was not going to lie anymore.

Zamora then spoke about what he would do in the future if he was set free. He mentioned his struggles with drug use. Detective Avelar told Zamora this was his chance to state what had happened in this case, and Zamora responded that he was "never there" and had heard from others that he had been involved in a shooting, but that this was not correct, and he fled.

---

**8**    In the transcription provided by the prosecution, Zamora replied "Okay" to this question.

Zamora stated that he had been using all kinds of drugs during the period around Thanksgiving, that he felt unloved and neglected at the time, and that he wanted to turn himself in but could not let go of his freedom.

Zamora told Detective Avelar that "[w]hen this happened" he went to Mexico. Detective Avelar told Zamora, "We thought you were dead." Zamora responded that he was shot, sliced in the neck and beaten for hours "over there." Zamora claimed "mafia people" almost killed him and that was why he came back.

Zamora said his mother had gotten him locked up in a rehab clinic in Mexico and it had been hard. Zamora and Detective Avelar talked about gangs. Detective Avelar talked about how he came to the United States as a young child, and Zamora related his experience of coming to the United States through the desert.

Detective Avelar asked Zamora if he wanted to call his mother, but Zamora was not sure, and he did not have his mother's number. Zamora and Detective Avelar then discussed how life would be in jail and having visits while in custody.

Detective Avelar told Zamora that, while Zamora might go to jail, there were always two sides to a story and an explanation for everything. Detective Avelar mentioned that authorities really did not know how the shooting in 2011 had occurred. When Zamora asked Detective Avelar why people had said he "did it," Detective Avelar replied that he wanted to know the truth. Detective Avelar reiterated that there was always an explanation for everything and that, in order to be free, Zamora had to free his mind and say, "This is what happened."

Zamora asked how he could get out of custody the fastest way possible, and Detective Avelar replied that the best advice was for Zamora to tell the "whole truth." Zamora again insisted that he was never at the shooting and wondered how he could prove that because he was somewhere "probably lost doing drugs," which he did every day at that time. Zamora was evasive about whether he ever used Tino's SUV. When told by

Detective Avelar the only thing he could do was tell the truth, Zamora wondered how much more truthful he could be.

Zamora then said he did not want to lie. Detective Avelar then told Zamora he had seen him on the date in question in front of the apartment and stated Zamora's "it wasn't me" excuse did not work. Zamora said that he did not want to be locked up and did not know what Detective Avelar wanted him to do. Detective Avelar stated that he had no control as to how long Zamora would be "locked up."

Zamora stated that he knew he was going to do time because he ran away. But again, Detective Avelar stated that there was an explanation for everything, and Zamora needed to tell the truth. Detective Avelar told Zamora that the police knew he had been at the shooting and that he had fled.

Zamora then said he was in Fresno getting drugs when the shooting occurred and that he then spent the night on the road before going to Mexico. He ran away because he did not want to get locked up. He continued to do drugs and he then went to rehab. He had come back from Mexico only a few weeks prior. He reiterated that he was not at the shooting.

When asked if he and Isaac were close, Zamora said he had met Isaac once in the distant past.

Zamora then asked about someone else the police had apprehended in connection with the case. Detective Avelar stated that through his investigation he thought that another person in custody in this case had been shooting at Zamora. Zamora claimed not to have a gun.

Detective Avelar told Zamora he was throwing away his opportunity to provide an explanation. Zamora said he was going to fight this case, and again claimed that he did not know what occurred at the shooting.

Detective Avelar said he was trying to help Zamora. Zamora said that, if Detective Avelar wanted to help, he would obtain a lawyer for Zamora to consult. Detective Avelar

confirmed that Zamora wanted a lawyer and told him he was not mad at him and did not blame him.

Detective Avelar then stated he needed information for the booking sheet and a DNA sample from Zamora. Zamora said he was not consenting to a DNA swab and told Detective Avelar, "[Y]ou can't do anything until I have a lawyer." Detective Avelar then asked Zamora booking questions—name, address, height, weight, date and place of birth. Zamora responded to the questions and acknowledged he made up the name "Eduardo Guzman."

After the booking questions, Zamora asked Detective Avelar how he could get out of this situation as fast as possible. Detective Avelar responded that Zamora would have to go through the court process and his lawyer would answer those questions. Zamora asked what kind of sentence he was facing, and Detective Avelar responded that he did not know.

Zamora again asked Detective Avelar, "How can you help me, Sir?" Detective Avelar responded that he had tried to help by attempting to take a statement from Zamora and tried to get the truth. Detective Avelar then informed Zamora that he could not make any promises or deals with him, and Zamora had to work that out with the District Attorney's office. Detective Avelar then placed handcuffs on Zamora and the interview concluded.

*Motion to Suppress*

Prior to trial, defense filed a motion to suppress Zamora's pretrial statement to Detective Avelar due to "*Miranda* violations," as any waiver by Zamora was due to repeated badgering and police coercion. The prosecutor filed an opposition to the motion, arguing Zamora validly waived his *Miranda* rights and, in any event, the statements were admissible for impeachment purposes. Defense counsel followed with a reply to the opposition.

At a hearing on the motion, the parties argued the issue, and the trial court took the issue under submission, stating it would watch the recording of the interview.

18.

Several days later, the trial court ruled that Zamora's statements to Detective Avelar were inadmissible in the prosecution's case-in-chief, but were admissible should Zamora testify at trial inconsistently with his prior statements.

*Zamora's Trial Testimony*

At trial, Zamora testified that, on the evening in question, he was confronted by Joe, Isaac, and Young, and fired his nine-millimeter firearm in the direction of Isaac after having been shot by Isaac.

On cross-examination, the prosecutor questioned Zamora about his pretrial statement to Detective Avelar, which were inconsistent with his trial testimony. Near the beginning of the prosecutor's cross-examination on this subject, defense counsel objected "to this line of questioning regarding statements made to Detective Avelar .…" The objection was overruled.

*Applicable Law and Analysis*

There is no dispute that Zamora requested an attorney multiple times during his police interrogation and, therefore, his statement was obtained in violation of his *Miranda* rights. After Zamora took the stand during trial and testified that he acted in self-defense, however, the prosecutor used his statement, in which he denied being involved in the crime or being present in the area, for impeachment purposes. The trial court found Zamora's statement was voluntary and, therefore, admissible for impeachment. On appeal, Zamora claims that his statement to police was involuntary, and the trial court erred in concluding otherwise. The People maintain that the trial court did not err. We agree no error occurred.

"[T]o protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' [Citations.] If the suspect knowingly and

intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' " (*People v. Martinez* (2010) 47 Cal.4th 911, 947; see also *People v. Case* (2018) 5 Cal.5th 1, 20; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1085-1086.)

While there is longstanding disapproval of the tactic (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1077 (*Nguyen*), citing *People v. Neal* (2003) 31 Cal.4th 63, 90 (*Neal*) [conc. opn. of Baxter, J.] and & *People v. Peevy* (1998) 17 Cal.4th 1184, 1205), a statement obtained in violation of *Miranda*, even deliberately, is admissible for impeachment purposes so long as the statement was voluntary (*Neal, supra*, at p. 78, citing *Peevy, supra*, at p. 1188; accord, *People v. Sanchez* (2019) 7 Cal.5th 14, 58; *People v. Case, supra,* 5 Cal.5th at pp. 24–25; *Nguyen, supra*, at pp. 1075–1078).

"A statement is involuntary [citation] when, among other circumstances, it 'was " 'extracted by any sort of threats ..., [or] obtained by any direct or implied promises, however slight ....' " ' [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " (*Neal, supra*, 31 Cal.4th at p. 79; accord, *Nguyen, supra*, 61 Cal.4th at p. 1078.) However, "[p]olice coercion is ... crucial. To be considered involuntary, a confession must result from coercive state activity." (*People v. Sanchez, supra*, 7 Cal.5th at p. 50, citing *Colorado v. Connelly* (1986) 479 U.S. 157, 165 & *People v. Smith* (2007) 40 Cal.4th 483, 502.)

" 'In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained.' " (*People v. Martinez, supra,* 47 Cal.4th at p. 949; accord *People v. Case, supra,* 5 Cal.5th at p. 20.) Where, as here, "an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

As previously stated, the trial court determined Zamora's statement inadmissible other than for impeachment. We have reviewed the video of Zamora's interrogation in full and conclude that his claim of coercion is not supported by the record. Continuing an interrogation in the face of repeated requests for counsel is a factor for consideration in determining whether a statement is involuntary. Zamora contends Detective Avelar's tactics were coercive, as he was questioned when he was handcuffed to a chair, without shoes, in a small, windowless interrogation room. Zamora also cites the fact that he was young at the time, he was inexperienced when dealing with the police, and the interview lasted "well over 2 hours."

In *Neal*, the California Supreme Court was most concerned with the continued interrogation of the defendant despite his repeated invocation of his right to remain silent and his right to counsel, but other factors also informed its determination that the defendant's confession was involuntary, including "the circumstance that [the] defendant remained in custody without being provided access to counsel before requesting to speak to [the detective]; [the] defendant's youth, inexperience, minimal education, and low intelligence; the deprivation and isolation imposed on [the] defendant during his confinement; and the promise and the threat [the detective] made to defendant during the initial interrogation after questioning should have ceased ...." (*Neal, supra,* 31 Cal.4th at p. 78.) The defendant in *Neal* was only 18 years old at the time of his interrogations, he had failed to graduate from high school and his intelligence "was quite low." (*Id.* at p. 84.) He was questioned on three separate occasions and, between the first and second interrogations, he was detained overnight in a cell without access to a toilet or water. In addition, he was not provided with any food until after the third interrogation, which was more than 24 hours later. (*Id.* at pp. 74, 76.)

In this case, Zamora was 22 years old at the time of the interrogation and had sustained numerous juvenile adjudications. He himself volunteered several times during the interview instances of his own past contact with law enforcement. While the interview

lasted two-and-one-half hours, there is no indication Zamora was deprived of food, water or restroom facilities. In fact, during the interview, Detective Avelar asked Zamora several times if he was comfortable and needed anything. There was no indication Zamora was physically or mentally impaired. His responses to questions were on topic and he was introspective at times. Detective Avelar never threatened violence or made any threats or promises of any kind toward Zamora or his family. The video recording evidences no aggression or other tactics designed to break Zamora's free will and, while Zamora cries on several occasions during the interview, the style of questioning is always conversational.

Having evaluated the totality of the circumstances in this case, we find no error in the trial court's determination that Zamora's statement was voluntary and therefore admissible for impeachment purposes. In light of this conclusion, we need not address whether the admission of Zamora's statement was prejudicial.

## II. WAS THERE A *BRADY* VIOLATION OR PROSECUTORIAL MISCONDUCT?

As part of a claim of prosecutorial misconduct (which we address later), Zamora asserts that the prosecutor willfully suppressed evidence, and he raises an alleged *Brady* error. We find no error.

### *Procedural Background*

At trial, Joe denied ever having told Detectives Hanes or Wallace, who interviewed him, that Young fired two to four shots at Zamora with a .45-caliber gun.

Zamora's defense at trial was that he shot the victim in self-defense, that two of the three men who confronted him, Isaac and Young, pulled out guns, and Joe tucked his shirt over an object on the front of his body. After words were exchanged, Zamora feared for his life and pulled out his own gun, cocked it, and told them he would shoot back if shot at. Following additional words, the four appeared to disband, Zamora heard one yell "Norte, bitch," and then shot Zamora. Zamora fired back.

Detective Hanes had been called to testify at the 2016 preliminary hearing as a prosecution witness. At the preliminary hearing and in her police report, Detective Hanes stated that, when she spoke to Joe after the shooting, he said, in part, that the first shots fired that night were fired by Young. She testified at trial as a defense witness after the prosecution chose not to call her as a witness. At the 2019 trial, she acknowledged that the purported statement by Joe that Young had a gun was not included in the recording of Detective Hanes's interview with Joe, although a small part of the interview was not recorded. Detective Hanes testified she had reviewed the audio recording and that Joe did not tell her that Young was armed or that he had fired his gun. She further testified that her earlier testimony had been a mistake.

Detective Wallace testified for the prosecution that he never heard Joe say that anyone other than Zamora had a gun during the shooting. The defense recalled Detective Wallace to question him about the discrepancy between his trial testimony and his report which stated that Joe had said this. Detective Wallace explained that his report was a supplemental report and merely summarized the other police reports, including Hanes's report referring to a statement that Hanes believed Joe had made. When asked by the prosecutor how this had occurred, Detective Wallace stated that he had been asked to "essentially" take a very large investigation with many documents and condensed it to a "readable understandable version in a page or two."

During the evidentiary portion of the trial, Zamora filed a motion to dismiss based on the alleged prosecutorial misconduct and discovery violations for not providing notice that the trial testimony of Detectives Wallace and Hanes would be contrary to their reports and Detective Hanes testimony would also be contrary to her prior testimony at the preliminary hearing.

The following day, the trial court denied Zamora's motion and ruled that there was no prosecutorial misconduct or discovery violations. The trial court did not believe Detective Wallace's position in the case had ever changed. It also noted no information was

presented that the prosecutor was aware that Detective Hanes was going to testify adversely to her report, and that the defense was on notice regarding potential conflict between Detective Hanes's report and the recorded statement with Joe, as it had been provided with a transcript of the recorded statements.

After the jury rendered its verdict, Zamora filed a motion for new trial, arguing that the prosecutor engaged in misconduct when he suppressed information about the upcoming testimony of Detectives Hanes and Wallace, namely that the testimony was inconsistent with pretrial statements made by Joe about whether Young had fired a gun during the shooting. Zamora alleged this disclosure failure violated *Brady, supra,* 373 U.S. 83.

The trial court denied Zamora's claim, concluding that there was no evidence Detective Wallace's trial testimony had changed over time and there was no evidence the prosecution was aware that Detective Hanes's trial testimony would be different from her reports or the preliminary hearing. The trial court noted specifically that the defense had received Detective Hanes's report and preliminary hearing testimony, and knew that this was inconsistent with Joe's recorded interview.

### Zamora's Claim

Zamora claims that "the reason why the prosecution did not place Detective Hanes on its witness list is due to the fact that the prosecution was aware that her testimony would change drastically between the preliminary hearing and trial," violating the prosecution's *Brady* obligation to reveal that fact. Zamora also contends Detective Wallace's part in this was also *Brady* error and prosecutorial misconduct, in that both instances were failures to disclose in a timely manner material exculpatory evidence which could be used to impeach key prosecution witnesses.

### Brady Violation

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

24.

In *Brady*, the high court held that the prosecution's suppression of favorable evidence to an accused upon request violates due process, irrespective of the prosecution's good or bad faith, if the evidence is material to either guilt or punishment. (*Brady, supra,* 373 U.S. at p. 87.)  The defendant has the burden of showing materiality.  (*In re Sassounian* (1995) 9 Cal.4th 535, 545.)  There are three components of a true *Brady* violation: The evidence at issue must be (1) favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.)

The United States Supreme Court holds that, under *Brady*, a state must disclose evidence favorable to the defense, which "turns on the cumulative effect of all such evidence suppressed by the government, and we hold that the prosecutor remains responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention."  (*Kyles v. Whitley* (1995) 514 U.S. 419, 421.)  A defendant is entitled to a new trial if the "net effect" of the withheld evidence raises "a reasonable probability" that a different result would have occurred with disclosure.  (*Id.* at pp. 421-422.)  " 'A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." ' "  (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 40, quoting *Smith v. Cain* (2012) 565 U.S. 73, 75.)

Here, we find no *Brady* error.  The evidence Zamora complains of was suppressed, i.e., the trial testimony by Detectives Hanes and Wallace that was inconsistent with prior testimony and/or written reports, was not suppressed but actually presented during trial. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467 ["Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery."]; *People v. Verdugo* (2010) 50 Cal.4th 263, 281 ["

25.

'[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery.' "].)

Further, there is no evidence that the prosecution sought to suppress the evidence in question. By exercising reasonable diligence, the defense could have discovered the potential inconsistencies as it had both the police reports and Joe's recorded police interview. As stated by our Supreme Court in *People v. Salazar* (2005) 35 Cal.4th 1031 in addressing a claim of *Brady* error:

> "Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him. [Citation.] If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. [Citations.] Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it ' "by the exercise of reasonable diligence." ' " (*Id.* at pp. 1048-1049.)

Finally, for *Brady* purposes, Zamora's claim fails because the allegedly "suppressed" information was not material or favorable. Evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. (*United States v. Bagley* (1985) 473 U.S. 667, 674, 676; see *In re Sassounian, supra,* 9 Cal.4th at p. 544.) Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. (*Bagley, supra,* at pp. 682-683; see *In re Brown* (1998) 17 Cal.4th 873, 887.) Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. (E.g., *Banks v. Dretke* (2004) 540 U.S. 668, 699.) Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review. (*Kyles v. Whitley, supra,* 514 U.S. at p. 435.)

Here, the allegedly suppressed information was not helpful to Zamora, and we find no *Brady* error occurred.[9]

*Prosecutorial Misconduct*

Zamora further claims that the prosecutor committed misconduct by failing to place Detective Hanes on its witness list due to the prosecution's awareness that Detective Hanes's testimony would drastically change between the preliminary hearing and the trial.

Under federal law, a prosecutor's conduct requires reversal if it " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.)  Under state law, "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury" is misconduct that requires reversal only when it is reasonably probable that the defendant would have received a more favorable result if the misconduct had not occurred.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000; *People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375.)

There is no evidence that the prosecutor was aware, prior to trial, of a change in testimony by Detective Hanes from that given at the preliminary hearing.  To the contrary, when Detective Hanes testified for the defense on direct examination, she testified that Joe had said prior to trial that Young fired a gun even though a recording of her interview with Joe did not include such a statement.  She further stated that part of her interview with Joe was not recorded, but she believed Joe had stated that Young had a gun and fired during the incident.  It was not until cross-examination when Detective Hanes admitted that she may have made the assumption that Young had a gun.  The back and forth between defense and prosecution questioning revealed Detective Hanes to be unsure about what she had heard,

---

[9]     We further reject Zamora's argument that the trial court prejudicially erred when it declined to give the jury an instruction that the prosecutor committed discovery violations pursuant to *Brady*.  Because we find no *Brady* error occurred, there was no need to give such an instruction.  (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40 [trial court need only give a requested instruction if it is supported by substantial evidence, i.e., evidence sufficient to deserve jury consideration].)

but she did testify that, based on her discussions with Joe and/or her reports, that Zamora fired first during the shooting in question.

Nor is there any affirmative showing of why the prosecution left Detective Hanes off of the prosecution's witness list. As for Detective Wallace, long before trial, the prosecutor disclosed to the defense its plan to call Detective Wallace as a witness, along with his address.

In any event, Zamora cannot show any possible misconduct was prejudicial. While Detective Hanes and Detective Wallace's trial testimony was unfavorable to Zamora, it was inconsequential to the determination of Zamora's guilt, based on all of the other evidence presented at trial, including Zamora's flight from the scene, his lack of candor before and during trial, and the inconsistencies in other defense witness's testimony. Even if Joe had told the police that Young had fired a weapon, Detective Hanes's understanding was always that Zamora fired first. In addition, Zamora's claim of self-defense was not against Young, who supposedly had the weapon, it was against Isaac, as Zamora claimed he fired in Isaac's direction after Isaac shot him. And yet the evidence at trial was that Isaac was shot in the back twice.

We find no prosecutorial misconduct and reject Zamora's claim to the contrary.

III.    DID THE TRIAL COURT ERR WHEN IT EXCLUDED EXPERT GANG TESTIMONY?

Zamora next contends the trial court prejudicially erred when it excluded proposed gang expert testimony as it deprived him of presenting a complete defense. We disagree.

*Background*

Six months before trial, Zamora filed a memorandum/offer of proof regarding the prospective testimony of a gang expert named Dr. Jesse De La Cruz. In the memorandum, Zamora argued that the shooting may have been gang related or gang motivated. A letter from Dr. De La Cruz, attached to the memorandum, states that he believed the instant case "although not gang-related, is without a doubt, in my opinion gang motivated." In his letter,

28.

Dr. De La Cruz states Zamora was associated with the Norteño street gang in the past and Isaac was a known Lemoore Norteño gang member. According to Dr. De La Cruz, Jessica Sanchez, a cousin of Zamora's, said she had received threatening phone calls. Although she did not say the calls were from gang members, Dr. De La Cruz was certain that they were. Dr. De La Cruz also concluded in his letter that there were multiple gunshots on the evening in question, based on a statement reportedly made by Elsa Gayton. The letter states further, without more, that there was "other evidence" supporting his "conclusion."

Prior to trial, the issue was discussed in court and defense counsel asserted Zamora was a gang dropout, and prior to the shooting in this case, the Norteño gang had a hit on him. Counsel further claimed the three people who confronted Zamora on the night in question were Norteño gang members. Counsel stated, "whether or not this is relevant evidence will probably have to be determined as the case sort of shakes out."

The prosecutor argued that Joe confronted Zamora on the evening in question because he believed Zamora was abusing his sister, whom Zamora was dating. The prosecutor argued that the defense's gang expert testimony was speculative, lacked foundation, and was baseless. The prosecutor stated that he had spoken to his own gang expert, who did not believe Zamora was a gang drop out at the time of the shooting. The prosecutor noted there was no evidence of a "hit" on Zamora, and that Joe and Cynthia were not Norteño gang members. While the prosecutor conceded that Isaac was a "shot caller," he did not think that the evidence would show this to be a gang related or gang motivated shooting.

Defense counsel stated that, shortly before the shooting, Zamora was arrested in relation to having intercepted "kites" written by Norteños and, based on these "kites," Zamora believed there was a hit on him at the time of the shooting.

The trial court stated that it had a hard time seeing the relevance of the proposed gang expert testimony, but did not intend to rule on it at that time. It did state that, since the

29.

proposed evidence was a bit attenuated "right now," absent other evidence to establish a gang connection, the proposed gang expert testimony by the defense would be excluded.

During trial, Joe testified that, when he and the others arrived at Gaytan's house, Young and Isaac got out of the car and spoke to Adrian, who was "pretty much" in the same gang as Isaac and Young. Joe claimed not to be part of that gang. Joe also testified that Isaac and Zamora knew each other "through the gang."

During Joe's testimony, a sidebar was held in which defense counsel asked to question Joe about Isaac's gang affiliation. The trial court believed the evidence was not relevant, but left open the possibility that such evidence might become relevant in the future.

Zamora testified, inter alia, that he obtained a weapon at one point because he had received threats from Norteño gang members. The trial court sustained an objection to this answer and struck it. Defense counsel then asked Zamora who had threatened him, and he said "Norteno gang members." The prosecutor again objected, and the trial court cleared the courtroom to discuss the matter.

The trial court then told the parties that the "Norteno aspect" was not relevant unless there was some connection to "these parties." The trial court stated that it did not want to go "down the rabbit hole on some tangential issue that isn't relevant. You have direct threats from Mr. Donez on evidence that's already been presented. That is what this case is about." While the trial court stated that the defense of Zamora receiving a threat and arming himself as a result of that threat was fine, the "gang" was not relevant and, pursuant to Evidence Code section 352, would "take an undue consumption of court time, distract the jury, mislead the jury, and isn't relevant to these proceedings."

Defense counsel then reminded the trial court that its ruling during motions in limine was tentative and asked that Zamora be allowed to testify that he was confronted by Young, Joe, and Isaac, who Zamora knew to be a shot caller for the Norteño gang, and that this would help explain his state of mind and response during the shooting.

30.

After the trial court stated that it had not heard any evidence to suggest the incident was gang related "in any way," defense counsel requested a foundational hearing pursuant to Evidence Code section 402.

At the Evidence Code section 402 hearing, Zamora testified that he was associated with "Northerners" when he was about 15 years old, but separated from the group when his son was born. He was then labeled a "dropout" and resented for choosing his family over the gang. When Zamora was 18 and in jail, he was removed from the Northerner pod because of his label as dropout. After he got out of jail, he was jumped, robbed, and shot at by Northerners.

Zamora testified that, after he got out of jail, he met with gang task force officials and saw some "kites." Based on these "kites," Zamora felt that his life was in danger, so he armed himself. He also received other threats and, a couple of weeks prior to the shooting, was assaulted at a gas station and jumped and robbed by Norteños.

On the night in question, Zamora testified that Joe and Isaac were both armed, and Zamora thought Isaac and Young, who were both Norteños, were going to kill him. Isaac had a high status in the Norteño gang at the time.

Following Zamora's testimony at the hearing, the trial court heard additional argument from the parties. The trial court ruled that Zamora could testify he was a gang dropout and armed himself out of fear of retaliation, but other gang evidence was inadmissible under Evidence Code section 352. The trial court stated that there was no testimony about what the actual threat was to Zamora from the Norteños, and there was no evidence that Young, Isaac or Joe were aware of a supposed hit placed on Zamora by the Norteños. The trial court further noted that there was no evidence that the current incident was gang-related, as there was no evidence of gang clothing or gang threats, and it was not reasonable for Zamora to assume this was a gang hit given the expressed threats by Joe as it related to Zamora's treatment of Joe's sister.

Zamora then spoke with defense counsel off the record, and counsel then stated that Zamora was prepared to testify that, when Isaac shot at him, he heard Isaac say, " 'Norte bitch,' " and asked if Zamora could testify to that.

The trial court said it would permit such testimony, but noted that this was the first time this detail had ever been mentioned by the defense, even though the issue relating to gang evidence had been previously raised.

When trial testimony resumed, Zamora recounted the details of the shooting and testified that he heard Isaac yell "Norte, bitch" before Zamora was struck by a bullet.

On October 4, 2019, after the jury rendered its verdict, Zamora filed a motion for a new trial arguing, inter alia, that the trial court erred by excluding gang evidence and gang expert testimony.

Addressing this part of the motion, the trial court noted that, during the motion in limine on the issue, there was no evidence to indicate that this was anything other than a family dispute, and Zamora offered no new evidence suggesting a gang nexus to the shooting. The trial court noted that, when the issue was addressed a second time, that trial court again found no gang nexus for the shooting. It also noted that the issue of Zamora arming himself for his own safety from the Norteños was "simply not proper subjects of expert testimony." The trial court observed that, shortly after making its later ruling, Zamora turned to defense counsel, whispered to him, and then, for the first time, indicated that Zamora had said someone shouted "Norte," or something to that effect. While the trial court did not find this believable, it allowed Zamora to so testify. The trial court stated that, other than this "eleventh hour" " 'Norte' " reference, the evidence did not suggest a gang motive for the shooting. The trial court concluded that the probative value of gang evidence was minor and would be extraordinarily time consuming, and there was no error in excluding the evidence.

*Forfeiture*

The People contend Zamora forfeited the argument that the trial court erred in excluding proposed gang expert testimony by the defense because the trial court never specifically ruled that Dr. De La Cruz's proposed testimony was inadmissible and Zamora did not renew his request during trial.  The People are correct that a pretrial evidentiary request the trial court does not rule on will not preserve the issue for appeal "if the appellant could have, but did not, renew the objection ... and press for a final ruling in the changed context of the trial evidence itself."  (*People v. Holloway* (2004) 33 Cal.4th 96, 133; accord *People v. Ennis* (2010) 190 Cal.App.4th 721, 735-736; see, e.g., *People v. Johnson* (2018) 6 Cal.5th 541, 586 [defendant forfeited the argument the trial court erred in tentatively sustaining an objection because the defendant "fail[ed] to press for a final ruling"].)  By not pursuing the matter, Zamora forfeited it.  (See *Ennis, supra,* at p. 736; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1181.)

*Law and Analysis of Excluded Expert Testimony*

Even if Zamora has not forfeited the argument, it lacks merit.  We disagree with Zamora that the trial court abused its discretion in excluding the proffered evidence and find exclusion of the evidence did not impermissibly infringe on Zamora's right to present a defense or otherwise violate his constitutional rights.

Only relevant evidence is admissible.  (Evid. Code, § 350.)  "Evidence is relevant if it has a 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  (Evid. Code, § 210.)"  (*People v. Wright* (2021) 12 Cal.5th 419, 448.)  Under Evidence Code section 352, a trial court has wide discretion to exclude evidence, even relevant evidence, " 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' "  (*People v. Dworak* (2021) 11 Cal.5th 881, 899.)  As our Supreme Court has explained, "we review trial court decisions about the admissibility of evidence for abuse of discretion.

Specifically, we will not disturb a trial court's admissibility ruling ' "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 97.)

Here, the probative value of Zamora's proposed gang expert testimony was weak. In a letter, Dr. De La Cruz, Zamora's proposed gang expert, opined that this case was not gang-related, but gang motivated. This opinion was based on Dr. De La Cruz's understanding of Zamora's past association with the Norteños, that Isaac was a known Norteño, and on information received from one person, Zamora's cousin, that she had received threatening phone calls and another person had heard multiple gun shots on the night in question. But Dr. De La Cruz failed to explain how a shooting involving two individuals, both somehow connected with the Norteños, made this a gang shooting; the telephone calls received by Zamora's cousin did not say they were made by Norteño gang members or when they were made; and multiple gun shots does not demonstrate one way or the other whether the shooting was gang motivated. In addition, there was solid evidence that the actors were involved in underlying family dynamics, which led to Joe confronting Zamora.

As noted by the trial court, gang expert testimony would have taken up an undue consumption of time — needing to lay a foundation for the existence of the Norteños or a specific subset of the Norteños; Zamora and/or Isaac's association with the specific gang; whether Zamora was considered a dropout of the gang; and the existence of the alleged "kites" and specifically what they said.

In addition to the fact that the probative value of the proposed evidence was weak, there were no gang charges or enhancements in this case and the potential for prejudice was high. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 ["[E]vidence of gang membership [would have been] potentially prejudicial and should not [have been] admitted if its probative value [was] minimal."]; see also *People v. Williams* (1997) 16 Cal.4th 153,

193 ["[E]ven where gang membership is relevant, because it may have a highly inflammatory impact on the trial, trial courts should carefully scrutinize such evidence before admitting it."].)

Because we find the trial court acted within its discretion in excluding gang expert evidence, we reject Zamora's claim to the contrary. Courts have long held that " ' "the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 607, quoting *People v. Babbitt* (1988) 45 Cal.3d 660, 683.)

IV.     DID THE TRIAL COURT ERR WHEN IT EXCLUDED WITNESS TESTIMONY ON THE ISSUE OF ZAMORA BEING SHOT IN LEMOORE?

Zamora next contends that the trial court erred prejudicially when it did not allow him to present additional witnesses to testify that Zamora had a gunshot wound when they saw him after the shooting. We find no error.

*Background*

At trial, Zamora testified that he turned to say something to Gaytan, Isaac yelled "Norte, bitch," and then shot Zamora in the shoulder, after which Zamora returned fire. Zamora testified he then got into the SUV and drove to Tino's residence. He was bleeding profusely from two places on his body due to the gunshot wound. He did not have a chance to clean up the SUV after the shooting.

At trial, the defense called Elizabeth Quair, who testified that she saw an injury to Zamora in the past on a date around Thanksgiving. According to Quair, she saw Zamora bleeding from his left, upper back.

During a break in Quair's testimony, the prosecutor alerted the trial court to defense counsel's intention to call "five people" to say that Zamora had a gunshot wound, which the prosecutor through was "pretty cumulative." The trial court agreed and told defense counsel

to "trim … down" that number, suggesting that the defense pick one or two of the "best witnesses on that topic." The trial court left open the possibility of additional witnesses on this topic if those additional witnesses offered something different from the other witnesses.

The following day, Zamora filed a written motion requesting the trial court allow "all relevant witnesses [(five)] who have percipient knowledge that he was shot before he left for Mexico."

That same day, the defense called Diaz, Zamora's sister, as well as Mendez, Zamora's aunt, who both testified that, on the evening in question, they saw an injury to Zamora. The wound was bandaged when Diaz saw it and cleaned and stitched when Mendez saw it.

The defense also called Edmonds, a former chief deputy coroner for Kings County, who examined Zamora in March of 2016, and saw what appeared to be a wound on Zamora's shoulder consistent with having been shot.

The following day, the trial court denied Zamora's motion to present all relevant witnesses, stating Zamora had been allowed a complete defense and had not been precluded from presenting evidence on that issue, but only precluded from presenting "cumulative evidence on that issue, those are two different things."

Following the verdicts, Zamora filed a motion for new trial and raised, as one of its arguments, that the trial court erred when it excluded witnesses with respect to Zamora "being shot in Lemoore."

At the hearing on the motion, defense counsel stated that one of the witnesses not allowed was Renee Vasquez (Zamora's girlfriend and Joe's sister), who was at the scene of the shooting. But defense counsel conceded that he did not know what Renee would have said during testimony, only that Renee had told a defense investigator in the past that she saw what appeared to be blood on Zamora's left shoulder on the night in question.

The trial court rejected the argument in Zamora's motion for new trial, noting that the defense did not have the right to call an unlimited number of witnesses on the issue and did

not identify any witnesses who would have added something different from the witnesses who had already testified at trial.

*Law and Analysis*

As noted above, Evidence Code section 352 permits the exclusion of relevant evidence where "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Cumulative evidence is also inadmissible under Evidence Code section 352 if it threatens to confuse or mislead the jury, or if it would necessitate undue consumption of time. (*People v. Burgener* (1986) 41 Cal.3d 505, 525, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753.)

We review a trial court order denying a motion to exclude evidence under Evidence Code section 352 for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 49.) The trial court's discretionary ruling under Evidence Code section 352 will not be disturbed unless the court acted in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

We find that the trial court acted within its discretion under Evidence Code section 352 when it excluded additional witness testimony on the topic of Zamora being shot in Lemoore. The record supports the trial court's finding that the evidence was cumulative and therefore unduly time consuming.

In addition, the probative value of the excluded witnesses appears to have been very limited. The defense wanted to call multiple witnesses on the same subject that Zamora had been injured after the shooting. The trial court permitted the defense to present three witnesses on that topic and left open the possibility of more witnesses if those witnesses offered something different from the other witnesses who testified. However, during trial, the defense did not provide names of additional witnesses, did not make an offer of proof regarding those witnesses, and did not argue additional witnesses would have new

37.

information to add to the topic.  In light of this omission, it is reasonable to deduce that the probative value of any new additional witnesses was slight, and the trial court properly exercised its discretion by excluding the additional witnesses on the same subject as cumulative.  (See, e.g., *People v. Cavanaugh* (1968) 69 Cal.2d 262, 271 [no abuse of discretion on the part of the trial court in limiting live alibi witnesses]; *People v. Mincey* (1992) 2 Cal.4th 408, 439 [cumulative evidence may be excluded under Evidence Code section 352].)

Zamora contends the alleged error implicated his federal constitutional rights to present a defense.  Not so.

"Although a defendant has the general right to offer a defense through the testimony of his or her witnesses, 'a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1183.)  "[T]here are instances where due process, the right to a fair trial, and other constitutional guarantees trump the rules of evidence." (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1019.)  But, "[a]s a general matter, a defendant has no constitutional right to present all relevant evidence in his favor. [Citation.]"  (*Ibid.*)

Here the trial court did not preclude Zamora from presenting a defense, it only limited the number of cumulative witnesses on one topic.  As such, Zamora was not denied a fair trial or otherwise denied the right to present a defense.

V.     DID THE TRIAL COURT ERR WHEN IT DENIED ZAMORA'S REQUEST TO INSTRUCT THE JURY WITH CALCRIM NO. 505?

Zamora next contends the trial court erred when in refused to instruct the jury with pinpoint language in CALCRIM No. 505.  We find no merit to his claim.

*Background*

The trial court instructed the jury pursuant to CALCRIM No. 505, in relevant part, as follows:

"The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed he was in in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger, and [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable, and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] If you find Joe Donez threatened the defendant in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable."

At the jury instruction conference, Zamora requested that the trial court provide additional language to CALCRIM No. 505 as follows: " 'someone who has been threatened with harm by a person in the past is justified by acting more quickly or taking greater self-defense measures against that person.' " The trial court denied the request.

*Applicable Law and Analysis*

Pinpoint instructions " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) "Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense ... if the theory proffered by the defendant is supported by substantial evidence" (*People v. Randolph* (1993) 20 Cal.App.4th 1836, 1841), the instruction is a correct statement of law (*People v. Bivert* (2011) 52 Cal.4th 96, 120), and the proposed instruction does not simply highlight specific evidence the defendant wishes the jury to consider (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.)

39.

The trial court may properly refuse an instruction highlighting a defense theory if it is "duplicative or potentially confusing." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1276.) "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857; see e.g., *People v. Gonzales, supra,* at p. 1276 [trial court did not err in refusing to instruct jury that " 'a person is not guilty of murder simply because he or she failed to stop someone else from committing a murder' " where topic was covered by standard aiding and abetting and child endangerment instruction and "giving two different instructions on the same topics would risk confusing the jury"].) Put another way, "[t]here is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.) The failure to give an instruction on even an essential issue "may be cured if the essential material is covered by other correct instructions properly given." (*Ibid.*)

In a claim challenging the denial of a pinpoint instruction, we apply an abuse of discretion standard. (*People v. Mora and Rangel, supra,* 5 Cal.5th at p. 497.)

Without deciding whether the proposed instruction was a correct statement of law, we find there was no substantial evidence to support such a pinpoint instruction. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1021 [trial court may refuse to give instruction requested by the defendant if the instruction is potentially confusing and/or not supported by substantial evidence].) The instruction proposed by Zamora states that someone who has been harmed or threatened by another can take greater self-defense measures "against that person." The evidence at trial showed that Joe had previously threatened Zamora. However, Joe was not the person who Zamora allegedly "took greater self-defense measures against." Instead, Zamora shot at and killed Isaac. There was no evidence that Isaac had ever harmed or threatened Zamora prior to the shooting.

We find no abuse of discretion on the part of the trial court in refusing to give the proposed pinpoint instruction, as adequate instruction on self-defense was given. We reject Zamora's claim to the contrary.

## VI. CUMULATIVE ERROR?

Zamora contends finally that cumulative error deprived him of a fair trial. "We have found no error, and where we assumed error, we have found no prejudice. Nor do we discern cumulative prejudice." (*People v. Edwards* (2013) 57 Cal.4th 658, 767; see *People v. Bell* (2019) 7 Cal.5th 70, 132; *People v. Westerfield* (2019) 6 Cal.5th 632, 728.)

## VII. SENATE BILL NO. 81

On October 4, 2019, the trial court sentenced Zamora to 15 years to life for the murder, plus 25 years to life for the associated firearm enhancement pursuant to section 12022.53, subdivision (d). Punishment on the remaining firearm enhancements were stayed.

In supplemental briefing, Zamora contends that remand is required to allow the trial court discretion to strike one or more sentencing enhancements, pursuant to section 1385. In 2021, the Legislature enacted Senate Bill No. 81, which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interests of justice. (Stats. 2021, ch. 721, § 1.) Most notably, under the newly enacted subdivision (c)(2)(B) of section 1385, if "[m]ulitple enhancement are alleged in a single case," "all enhancements beyond a single enhancement shall be dismissed." And in subdivision (c)(2)(C) of section 1385, if "[t]he application of an enhancement could result in a sentence of over 20 years," the trial court "shall ... dismiss[ ]" the enhancement. These requirements "shall apply to sentencings occurring after the effective date of" Senate Bill No. 81. (Stats. 2021, ch. 721, § 1, enacting § 1385, subd. (c)(7).)

Because Zamora's case is not yet final and the amendment could lessen any punishment (*In re Estrada* (1965) 63 Cal.2d 740, 744), any resentencing in this case will take place after Senate Bill No. 81 became effective on January 1, 2022.  As such, we agree with Zamora that the court must apply the new law in any such proceeding.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 674 [case remanded for option to retry on gang allegations, and resentence discretion on newly amended sections 654 and section 1385].)

## DISPOSITION

The matter is remanded for resentencing.  The judgment is otherwise affirmed.

FRANSON, J.

WE CONCUR:

POOCHIGIAN, ACTING P. J.

SMITH, J.